**Carl Zeiss STIFTUNG,**
**Plaintiff–Appellee,**

v.

**RENISHAW PLC, Defendant–Appellant.**

**RENISHAW PLC, Plaintiff–Appellant,**

v.

**Carl Zeiss STIFTUNG and Carl Zeiss, Inc., Defendants–Appellees.**

**No. 91–1007.**

United States Court of Appeals, Federal Circuit.

Sept. 20, 1991.

Rehearing Denied Nov. 26, 1991.

Stephen B. Judlowe, Hopgood, Calimafde, Kalil, Blaustein & Judlowe, New York City, argued, for Carl Zeiss Stiftung. With him on the brief were Roy C. Hopgood and Ira B. Winkler.

James A. Oliff, Oliff & Berridge, Alexandria, Va., argued, for Renishaw PLC. With him on the brief were William P. Berridge and Edward P. Walker. Also on the brief was Milton Sherman, Kaye, Scholer, Fierman, Hays & Handler, New York City, of counsel.

Before NIES, Chief Judge, SKELTON, Senior Circuit Judge, and MICHEL, Circuit Judge.

MICHEL, Circuit Judge.

Renishaw PLC ("Renishaw") is the owner of U.S. Patent Nos. 4,153,998 (the '998 patent) and 4,270,275 (the '275 patent), both directed to "touch-trigger" probes used in coordinate measuring machines. Renishaw appeals the judgment of the United States District Court for the Southern District of New York, entered after a bench trial in consolidated declaratory judgment and infringement actions, in favor of Carl Zeiss Stiftung and Carl Zeiss, Inc. (collectively, "Zeiss"), holding that Zeiss' products do not infringe claims 2 or 15 of the '998 patent or claim 1 of the '275 patent, and also holding that claim 3 of Renishaw's '275 patent is invalid as lacking utility under 35 U.S.C. § 101 and claim definiteness under § 112, and as obvious under § 103. *Carl Zeiss Stiftung v. Renishaw PLC*, 740 F.Supp. 1038, 18 USPQ2d 1817 (S.D.N.Y.1990). Because the court's alternative grounds for holding claim 3 invalid are erroneous, and because the court misconstrued claim 2 in such a way that its finding of no infringement is clearly erroneous, we reverse. The case is remanded for determination of damages as to claim 2, and for adjudication of any other issues properly raised by the parties that are not moot.

## BACKGROUND

The patents in suit relate to the technology of coordinate measuring machines ("CMMs"), devices for measuring the dimensions of objects to extremely fine precision. In a typical CMM, a probe containing a stylus is mounted to a movable arm above a table which supports an object to be measured. A control means in the CMM continuously monitors movement of the probe in the three coordinate directions, so that the precise location in space of the stylus tip is at all times determined to great accuracy. To make a measurement, an object is mounted on the CMM table, and the probe is moved towards the object until the stylus attached to the probe makes contact with the object. The coordinates of the stylus tip at the point of contact are recorded, thus giving a measurement of the position of one point on the surface of the object. The probe is then repositioned and moved towards another point on the object, this procedure being repeated a number of times until all such measurements as are necessary have been made. From the coordinates of the various points at which the stylus tip contacted different surfaces of the object, the dimensions of the object can be calculated by a computer. A CMM may be operated manually, or the features described may be automated for ease of use.

Accurate measurement by a CMM requires an accurate means to determine the precise point in space at which the stylus tip makes contact with the object to be measured. In addition, in an automated

CMM the probe movement must be halted as quickly as possible upon contact with the object so that the stylus does not "overtravel," i.e., continue moving against the object, potentially damaging the object and/or probe, before the computer controlling the CMM can stop movement. For both of these reasons, it is crucial that the probe signals the CMM's computer as quickly as possible when the stylus makes contact with the object to be measured.

Formerly, CMMs were operated by hand and used "hard probes," with a stylus rigidly mounted on the probe. Though inexpensive and satisfactory on manually operated CMMs, hard probes proved not to be as well-suited for use in the automated CMMs that were eventually developed because their rigid styli can easily cause damage to the probe or to the object being measured when the probe arm overtravels (as it always does). The development of automated CMMs thus created a need for a different type of probe.

In the early 1970s, David McMurtry invented the device which is the subject of the patents at issue here. McMurtry's "touch-trigger" probe solved many of the problems associated with hard probes, satisfied a long-felt need in the precision measuring industry, and has been an enormous commercial success. The company that McMurtry founded to commercialize his invention, Renishaw, sells large numbers of its touch-trigger probes to CMM manufacturers throughout the world.

McMurtry's touch-trigger probe utilizes a stylus which can move slightly within its mount, allowing for deflection upon contact with an object. Convergent surfaces, which fit together precisely when the stylus is in its rest position, establish a "kinematic mount": deflection of the stylus away from the rest position disturbs the seating of the convergent surfaces, sending a signal to the CMM that contact has been made.

In one embodiment of the McMurtry invention, depicted below in Fig. 1 (Fig. 1 of the '998 patent specification, with descriptive labels added), the stylus is mounted on a movable member which is urged into place against a fixed member by means of a spring. When the movable member is thus seated against the fixed member, an electrical circuit is completed at the convergent surfaces, allowing a current to flow. When the stylus makes contact with an object being measured, the movable member deflects against the force of the spring, breaking the electrical circuit at the convergent surfaces and sending a signal to the CMM indicating that contact has occurred. The coordinates of that contact point are then sent to the CMM's computer and recorded. Upon cessation of contact, the movable member is precisely and repeatably urged back to its rest position so that the convergent surfaces are again properly seated and the electric circuit is completed, ready for the probe to make another contact.

SPRING

CONVERGENT SURFACES
KINEMATIC SEAT
(unseats when stylus
touches object)

FIXED MEMBER

MOVABLE STYLUS
HOLDING MEMBER

STYLUS

OBJECT TO BE
MEASURED

FIGURE 1

Zeiss manufactures CMMs and in the late 1970s developed its own touch-trigger probes. Zeiss' probes, the accused devices in this lawsuit, also include convergent surfaces kinematic mounts which provide a signal when the movable member is unseated. In the Zeiss probes, however, the stylus is attached to the probe housing via a piezoelectric crystal transducer, a device which provides a signal when pressure is applied to it. The transducer is very quick and accurate, so that a signal is sent *immediately* upon contact, even before any deflection sufficient to break a circuit at the kinematic seats occurs. But the piezoelectric device is also very sensitive—not only actual contact with the stylus, but also noise or vibration (such as the slamming of a door) can produce a signal. Therefore, in order to accurately determine when contact has been made, the Zeiss probes use the signal from the kinematic seat to confirm the accuracy of the signal from the piezoelectric device. Only if a signal from the piezoelectric device is followed by a signal from the kinematic mount within a certain period of time is the piezoelectric signal deemed to have resulted from actual contact rather than from vibration. Then, the CMM's computer stops movement of the probe and records the coordinates of the stylus from the piezoelectric device's signal.

Zeiss filed suit in the United States District Court for the Southern District of New York against Renishaw for a declaratory judgment that the two McMurtry patents are invalid. Renishaw then sued Zeiss for infringement. The two actions were consolidated, and following a bench trial, the district court held that Zeiss' products do not infringe claims 2 or 15 of the '998 patent, nor claim 1 of the '275 patent. The court further held claim 3 of Renishaw's '275 patent to be invalid as lacking utility and claim definiteness under 35 U.S.C. §§ 101 and 112, respectively, and also as obvious under § 103. *Zeiss*, 740 F.Supp. at 1038, 18 USPQ2d at 1817.

We have jurisdiction over Renishaw's appeal pursuant to 28 U.S.C. § 1295(a)(1) (1988).

## DISCUSSION

We shall consider first the district court's findings of noninfringement. We then turn to the holding of invalidity of claim 3 of the '275 patent, as to both (A) lack of utility and claim definiteness and (B) obviousness.

## I. INFRINGEMENT

Analysis of whether an accused device infringes a claim of a patent begins with a determination of the scope of the claim, an issue of law which on appeal is freely reviewable. *Mannesmann Demag Corp. v. Engineered Metal Prods. Co.*, 793 F.2d 1279, 1282, 230 USPQ 45, 46 (Fed.Cir.1986). The properly interpreted claim must then be compared with the accused device. This application of the claim to the accused structure is a question of fact, which we review only for clear error. 793 F.2d at 1282, 230 USPQ at 46.

### A. Claim 2 of the '998 Patent

■ Claim 2 of the '998 patent is drawn to a probe for a CMM—a "device for mounting a stylus in position-determining apparatus"—and provides that "said device and an object are movable relative to each other for providing a signal when said stylus engages said object thereby indicating the position thereof," and includes "means for providing said signal when said movable member is removed from its rest position." [1] The district court interpreted this language to require that the probe produce an electrical signal "for the *purpose* of fixing the position of the" probe [2] and found that, since the accused devices use the signal from the kinematic mount only to confirm the validity of the signal from the piezoelectric crystal, there was no in-

---

**1.** The full text of claim 2 is set out in the Appendix to this opinion.

**2.** Though the claim language "for providing a signal when said stylus engages said object thereby indicating the position *thereof*" is some-

fringement. *Zeiss*, 740 F.Supp. at 1047, 18 USPQ2d at 1823 (emphasis added). As we discuss below, this interpretation of claim 2 is incorrect and the court's finding of noninfringement, derived from that claim interpretation, cannot stand.

Claim interpretation must begin with the language of the claim itself. *Smithkline Diagnostics, Inc. v. Helena Laboratories Corp.*, 859 F.2d 878, 882, 8 USPQ2d 1468, 1472 (Fed.Cir.1988). The language of claim 2 refers to the generation of a signal, which "indicat[es] the position" of the stylus, when the movable member is removed from its rest position. The district court, however, read the claim to require that the claimed "signal" provide the coordinates used for measurement. However, a limitation as to use of the signal is nowhere to be found in the claim itself. Indeed, use of the signal, whether to generate coordinates in the first instance (as in the probes Renishaw markets) or only to confirm the validity of another signal (as in Zeiss' accused devices), takes place not in the probe itself, but in the electronic circuits to which that probe is attached. Since only a probe, and not the associated circuitry, is described in the claim, the trial court's interpretation is not directed to the *claimed* invention.

■ As the district court recognized, in interpreting a claim of a patent, a court may properly look to the patent's specification, to the prosecution history of the patent, and to the other claims in the patent. *Mannesmann Demag Corp.*, 793 F.2d at 1282, 230 USPQ at 46. The district court's analysis of the specification, however, is incorrect. The court concluded that "[t]here is nothing in the specification in regard to any embodiment which describes a signalling device which is activated by a piezoelectric element or other means immediately upon the contact of the stylus with the workpiece prior to the stylus being deflected." *Zeiss*, 740 F.Supp. at 1046, 18 USPQ2d at 1823. Though true, the obser-

---

what ambiguous, reading the specification makes clear that "thereof" must refer to the position of the *stylus* (which moves) when it contacts the object, not the position of the *object* (which remains stationary).

vation is irrelevant. The point is not whether the specification suggests the use of any means of signalling contact other than the kinematic mount claimed, but rather, whether the claim and specification in effect preclude any additional signalling means or otherwise require that the claim be limited to devices containing *only* the structures of the embodiments specifically described in the specification. Indeed, claim 2, which uses the term "comprising," is an "open" claim which will read on devices which add additional elements:

> It is fundamental that one cannot avoid infringement merely by adding elements if each element recited in the claims is found in the accused device. For example, a pencil structurally infringing a patent claim would not become noninfringing when incorporated into a complex machine that limits or controls what the pencil can write. Neither would infringement be negated simply because the patentee failed to contemplate use of the pencil in that environment.

*A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 703, 218 USPQ 965, 967–68 (Fed. Cir.1983), *cert. denied*, 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 171 (1984) (citation omitted). Thus, in this case, the addition of another signalling means using a piezoelectric crystal does not avoid infringement, even if McMurtry did not contemplate the possibility of such an improvement.

We have carefully examined the specification of the '998 patent, and can discover no suggestion in it that the signal from the kinematic mount alone must be used to determine position. The specification, as the district court noted, refers repeatedly to deflection of the stylus and means for detecting that deflection. But nowhere does the specification state or imply that this detection of deflection must be used as the sole means of calculating the coordinates of the probe.

Moreover, we have also examined the other claims of the '998 patent. Six of them, claims 1, 2, 10, 12, 14, and 15, are independent claims. None refers to any portion of a CMM external to the claimed

probe or to what is to be done with the signal from the kinematic mount after it is sent to the CMM. Nor has Zeiss pointed to anything in the prosecution history of the patents to indicate that such a limitation was intended.

In short, the district court's interpretation of claim 2 as requiring the signal generated upon deflection to provide the coordinates of the probe, rather than confirm the validity of another position-indicating signal, is incorrect. While the particular embodiments shown in the specification do not disclose any additional means that indicates position, other variations meeting all claim requirements may be created so long as such a signal is generated *"when"* the stylus contacted the object being measured. What is done with the signal thereafter is simply not limited in any way by claim language. The language of the claim merely requires that the kinematic mount produce a signal upon the unseating of the convergent surfaces, with no limitation as to how the signal is thereafter to be used, and there is no suggestion in the specification, prosecution history, or other claims that such a limitation is intended.

■ Having construed claim 2 of the '998 patent, we now turn to the second issue in the infringement inquiry, comparison of the properly interpreted claim with the accused devices. Infringement of a claim requires that the accused device meet every limitation of the claim, either literally or by equivalents. *E.g., Builders Concrete, Inc. v. Bremerton Concrete Prods. Co.*, 757 F.2d 255, 257, 225 USPQ 240, 241 (Fed.Cir.1985). In the case of claims with a means plus function element, such as claim 2, the element is met literally when an accused device embodies "the corresponding structure, material, or acts described in the specification *and equivalents thereof.*" 35 U.S.C. § 112, ¶ 6 (1988) (emphasis added). *See D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1573–74, 225 USPQ 236, 238–39 (Fed.Cir.1985). It is clear from the undisputed and properly found facts in the record on appeal that every structure of claim 2, properly construed in light of the specification, is in the accused Zeiss probes:

Even the district court found that the accused devices have a fixed member and a movable member to which the stylus is connected, have convergent surfaces and bias means for urging the movable member into a rest position defined by the convergent surfaces, and have means for providing a signal when the stylus contacts an object, which signal *does* indicate the position of the stylus at that point. *Zeiss,* 740 F.Supp. at 1042–43, 18 USPQ2d at 1819–20.[3] That the Zeiss CMM does not *"use"* this position signal itself to generate coordinates, but rather only to verify the accuracy of another position-indicating signal from a piezoelectric crystal on the stylus, does not avoid meeting any limitation of claim 2 and thus cannot negate infringement.

The district court seems to have focused on the fact that Zeiss' introduction of a piezoelectric element is an improvement upon the patented invention. Indeed, in view of Renishaw's use of piezoelectric elements in its own newer probes, this superiority appears to be undisputed. But an improvement upon a patented device does not necessarily avoid infringement. *Hoyt v. Horne,* 145 U.S. 302, 309, 12 S.Ct. 922, 924, 36 L.Ed. 713 (1892). *See also Marsh–McBirney, Inc. v. Montedoro–Whitney Corp.,* 882 F.2d 498, 504, 11 USPQ2d 1794, 1798 (Fed.Cir.1989), *vacated on other grounds,* — U.S. —, 111 S.Ct. 775, 112 L.Ed.2d 838 (1991), and *reinstated in part,* 939 F.2d 969 (Fed.Cir.1991).

The district court's finding that the accused devices do not infringe claim 2 is thus clearly erroneous. Moreover, the judgment of no infringement may be reversed, and not just vacated, because on this record, all underlying facts necessary to compel a finding of infringement have been found, correctly, and a remand on this issue for a new finding and for further analysis would serve no purpose.

**B. Claim 15 of the '998 Patent and Claim 1 of the '275 Patent**

Renishaw also challenges findings of no infringement of claim 15 of the '998 patent and claim 1 of the '275 patent. But in view of the fact that infringement of these claims would not give Renishaw a basis for greater relief as to Zeiss' accused devices (Renishaw conceded as much at oral argument), we need not and do not reach the issue of whether or not they are infringed.

Because the findings are not reviewed on appeal, we vacate the judgment of no infringement of claim 15 of the '998 patent and claim 1 of the '275 patent. *See United States v. Munsingwear,* 340 U.S. 36, 39–40, 71 S.Ct. 104, 107, 95 L.Ed. 36 (1950).

## II. VALIDITY OF CLAIM 3 OF THE '275 PATENT

Like the other claims at issue in this appeal, claim 3 of the '275 patent is directed to a "device for mounting a stylus in position-determining apparatus." [4] But unlike the other claims, it includes no mention of any signalling means or electric circuitry. It is in essence, then, a truncated version of claim 2 of the '998 patent, claiming fixed and movable members and a bias means, but no "means for providing" a signal when the movable member is displaced.

The district court made no findings as to whether Zeiss' probes infringed claim 3, holding only that claim 3 was invalid as lacking utility and claim definiteness, and as obvious. As we discuss below, each of these grounds of decision is incorrect, and the holding of invalidity must be reversed. On remand, the district court should make findings as to whether or not the accused devices infringe claim 3, unless the issue of infringement of claim 3 is rendered moot by our determination that the accused Zeiss products infringe claim 2.

**3.** Moreover, while it appears clear that the accused Zeiss probes embody the exact structures shown in the '998 specification, even if they do not, they are certainly close enough to constitute "equivalents thereof" within the meaning of § 112, ¶ 6.

**4.** The full text of claim 3 is set out in the Appendix to this opinion.

## A. Utility and Claim Definiteness

■ The district court found that what is stated in claim 3 "does not describe an operable probe...." *Zeiss*, 740 F.Supp. at 1049, 18 USPQ2d at 1825. The court found that the McMurtry invention involved more than simply seating and unseating the stylus, the function stated in claim 3. *Id.* at 1049–50, 18 USPQ2d at 1825. Rather, the court said, the specification makes clear that "the invention involves the *two* essential and inseparable functions of deflecting the stylus and detecting that deflection." *Id.* at 1050, 18 USPQ2d at 1825 (emphasis in original). Thus, because "[t]he unseating and reseating function described in claim 3 has no utility separate and apart from the signalling function," and because "the arbitrary presentation of *part* of an invention does not constitute a claim of a valid invention," the court held claim 3 to be invalid. *Id.*, at 1050, 18 USPQ2d at 1825–26 (emphasis in original).

Although the district court did not state the precise statutory basis for its holding of invalidity, the court appears, from the wording of the opinion as well as the case authority cited, to have relied on two distinct provisions of the patent law, the utility requirement of 35 U.S.C. § 101 and the claim definiteness requirement of the second paragraph of 35 U.S.C. § 112.

The utility requirement has its origin in article I, section 8 of the Constitution, which indicates that the purpose of empowering Congress to authorize the granting of patents is "to promote progress of ... *useful* arts." U.S. Const. art. I, § 8, cl. 8 (emphasis added). *See* 1 E. Lipscomb, *Lipscomb's Walker on Patents* 476 (3d ed. 1984). The current Patent Act provides that patents may be granted only for "new *and useful*" inventions, 35 U.S.C. § 101 (1988) (emphasis added). This language has been interpreted as embodying a fundamental requirement of American patent law, dating back some two-hundred years, "that one may patent only that which is 'useful.'" *Brenner v. Manson*, 383 U.S. 519, 528–29, 86 S.Ct. 1033, 1039, 16 L.Ed.2d 69, 148 USPQ 689, 693 (1966).

■ To meet the utility requirement, the Supreme Court has held that a new product or process must be shown to be "operable"—that is, it must be "capable of being used to effect the object proposed." *Mitchell v. Tilghman*, 86 U.S. (19 Wall.) 287, 396, 22 L.Ed. 125 (1873). Our cases have not, however, interpreted this language in *Mitchell* to mean that a patented device must accomplish *all* objectives stated in the specification. On the contrary, "[w]hen a properly claimed invention meets at least one stated objective, utility under § 101 is clearly shown." *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 958, 220 USPQ 592, 598 (Fed.Cir.1983), *cert. denied*, 469 U.S. 835, 105 S.Ct. 127, 83 L.Ed.2d 69 (1984). The utility requirement, though an essential requisite of patentability, has other limits. An invention need not be the best or the only way to accomplish a certain result, and it need only be useful to some extent and in certain applications: "[T]he fact that an invention has only limited utility and is only operable in certain applications is not grounds for finding lack of utility." *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 762, 221 USPQ 473, 480 (Fed.Cir.1984). Whether an invention claimed in a patent lacks utility is a question of fact, which we therefore review for clear error. *Raytheon*, 724 F.2d at 956, 220 USPQ at 596.

Here, the district court interpreted claim 3 as referring to a complete probe, and found a lack of utility because the claimed device could not function as a probe. *Zeiss*, 740 F.Supp. at 1049–50, 18 USPQ2d at 1825–26. This claim construction, a legal issue which we review de novo, is incorrect. It is clear on the face of claim 3 that it does *not* purport to claim a complete probe, an interpretation made even clearer when claim 3 is compared to the other claims in the patents. Indeed, the distinctiveness of claim 3 is that it claims much less than a complete probe. Nor does the device of claim 3 purport to provide a signal when the stylus engages an object as do the other claims on appeal. Rather, claim 3 claims a device whose function is simply "for mounting a stylus in position-determining apparatus," and it is clear

from the undisputed and properly found facts in the record on appeal that the device of claim 3 does perform this function. Moreover, it is equally clear that the subject matter of claim 3 *does* have a utility separate and apart from any signalling means: It mounts the probe, and it does so in a yielding manner so that it will not injure the object, or itself, by excessive pressure. Therefor, the first alternative basis of the holding of invalidity—that the invention as claimed lacks utility—must be reversed as clearly erroneous.

■ The second basis on which the district court seems to have relied for its holding of invalidity is the claim definiteness requirement, codified in the second paragraph of section 112: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." Whether the claim definiteness requirement was met is freely reviewable on appeal as a question of law. *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1576, 1 USPQ2d 1081, 1088 (Fed.Cir.1986).

The district court misapplied the claim definiteness requirement in holding claim 3 to be invalid for failure to claim the subject matter regarded as the invention. Focusing on the fact that claim 3 omits any electrical circuitry or other signalling means, the court concluded that the claim "does not describe McMurtry's invention." *Zeiss,* 740 F.Supp. at 1049, 18 USPQ2d at 1825. According to the district court, "[t]he McMurtry touch-trigger probe invention did not consist merely of moving the stylus back and forth between a rest and an unseated position, which is the function presented in claim 3." *Id.* at 1049–50, 18 USPQ2d at 1825. Stating that "the arbitrary presentation of *part* of an invention does not constitute a claim of a valid invention," the court essentially ruled that McMurtry cannot claim a part of his invention separate from the rest. *Id.* at 1050, 18

USPQ2d at 1826. This reasoning is legal error.

■ It has long been held, and we today reaffirm, that it is entirely consistent with the claim definiteness requirement of the second paragraph of section 112, to present "subcombination" claims, drawn to only one aspect or combination of elements of an invention that has utility separate and apart from other aspects of the invention. As one of our predecessor courts stated, "it is not necessary that a claim recite each and every element needed for the practical utilization of the claimed subject matter," as it is "entirely appropriate, and consistent with § 112, to present claims to only [one] aspect." *Bendix Corp. v. United States,* 600 F.2d 1364, 1369, 220 Ct.Cl. 507, 514, 204 USPQ 617, 621 (1979). Thus, the holding of invalidity that rests on a conclusion of lack of claim definiteness is legally incorrect.[5] Furthermore, the district court erred in looking only to the descriptive part of the specification to determine what McMurtry invented. It is to the claims which particularly point out what the inventor regards as his invention that one must look, and each claim must be considered separately. In one piece of apparatus disclosed as an embodiment of an invention, there may be several inventions; therefore, the claims are the place to look, and each claim must be considered separately.

Nor is this result inconsistent with the reasoning of *General Elec. Co. v. United States,* 572 F.2d 745, 215 Ct.Cl. 636, 198 USPQ 65 (1978), a case from one of our predecessor courts on which the trial court relied. The *General Electric* court stated that a claim "must recite a structure that is capable of performing its *purported* function," and held invalid under the second paragraph of section 112 a claim in which "the combination as claimed is inoperative for its *claimed* purpose." *Id.* 572 F.2d at 755, 198 USPQ at 73 (emphasis added). Here, on the other hand, as stated above,

---

5. Such subcombination claiming is also consistent with the utility requirement of section 101, so long as what is described in the claim has utility in itself. Here, as explained above, it is clear from the record on appeal that claim 3 particularly points out and distinctly claims subject matter which has its own utility.

the *claimed* device is capable of performing its *claimed* purpose of "mounting a stylus in position-determining apparatus" so as to provide for repeatable displacement and return to a rest position. Greater utility or more definite claiming than this is simply not required.

In sum, the district court's holdings that claim 3 is invalid for lack of utility and for failure to distinctly claim the subject matter which the inventor regards as his invention are based on a misconstruction of the claim and a misunderstanding of the applicable provisions of patent law. The first holding, therefore, is clearly erroneous and the second, legal error. Both must be overturned, and on this record, reversed.

### B. Obviousness

■ As a third alternative basis for its holding of invalidity, the district court held that claim 3 was obvious under 35 U.S.C. § 103 over a British book on mechanical design, H. Braddick, *Mechanical Design of Laboratory Apparatus* (1960), alone or in combination with a German text, W. Schmid, *Automatologie* (1952). The court properly acknowledged the importance of objective indicia of nonobviousness, such as long-felt need and commercial success, and found that "McMurtry's probe has satisfied a basic and important need in the precision measuring industry, and has been an enormous commercial success," *Zeiss*, 740 F.Supp. at 1051, 18 USPQ2d at 1827. But, finding that "claim 3 of the 275 patent does not describe McMurtry's probe," the court concluded that "[t]here is not the slightest evidence that what is set forth in claim 3—something which can wander about seating and unseating without taking measurements—has answered any industrial need or has had any commercial success whatsoever." *Id.* Thus discounting the objective evidence as irrelevant, the court held claim 3 invalid for obviousness. *Id.*

Obviousness is a question of law, and is thus freely reviewable on appeal. *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1568, 1 USPQ2d 1593, 1597 (Fed.Cir.), *cert. denied*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). However, the underlying factual inquiries of obviousness—the scope and content of the prior art, the differences between the prior art and the claims at issue, the level of ordinary skill in the art, and objective evidence as to secondary considerations—are reversible only for clear error. *See Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 872, 228 USPQ 90, 97 (Fed.Cir.1985).

The Braddick reference relied on by the district court discloses the use of the principles of kinematic design for locating one part in a fixed (i.e., static) position relative to another, in such a way that the parts can be displaced and then accurately and repeatably realigned with one another. Braddick, *supra*, at 12–15. Though acknowledging that "Braddick did not, of course, literally talk about using a kinematic mount in a probe for a CMM machine," the court stated that "Braddick spoke generally of applying the principle in scientific instruments," and held that "[t]he inevitable conclusion is that Braddick disclosed in plain textbook terms what is described in claim 3 of the 275 patent." *Zeiss*, 740 F.Supp. at 1051, 18 USPQ2d at 1826. Although worded like a finding of anticipation, this conclusion was, according to the court, one of obviousness. It is incorrect.

It is undisputed that the general principles of kinematic mounts involving convergent surfaces were well-known in the art of mechanical design, and the Braddick book merely reflects this fact. The invention of claim 3 is not, however, merely a kinematic mount, but a kinematic mount which permits a stylus to be repeatably deflected upon contact with an object to be measured in order to avoid injury to itself or the object. As the trial court acknowledges, the structure of Renishaw's stylus mount is nowhere disclosed in Braddick. Moreover, the reference in Braddick to applying the disclosed design principles to "scientific instruments" does not suggest what form such a structure should take in mounting a stylus.

Nor is the trial court's holding of obviousness buttressed by its additional reliance on the Schmid reference in combination with Braddick. Schmid is not directed

to the technology of probes for coordinate measuring machines, but rather to the construction of a copy milling machine with a tracing head that follows the contours of the piece to be copied. Schmid, *supra,* at 82–84. The court recognized that Schmid does not disclose a kinematic mount, but stated that it "does illustrate the concept of a spindle (or stylus) in a position-sensing device, which deflects and returns to a rest position." *Zeiss,* 740 F.Supp. at 1051, 18 USPQ2d at 1827. The court found that "[w]hen Braddick and *Automatologie* are combined, there is teaching of the deflection (unseating) of a stylus in a position-sensing device, the reseating of that stylus, and a means for making the seated position definite and precise through kinematic mounting." *Id.* Assuming combination of the two references is suggested, Schmid simply does not suggest the structure claimed in McMurtry's patent. The court's applying the teachings of Braddick to the device pictured in *Automatologie* does not suggest a device with a kinematic mount with convergent surfaces located at the seats. The stylus in *Automatologie* moves from its base only and has nothing comparable to a kinematically mounted moveable member to which the stylus is connected.

The trial court also discounted the objective evidence that the invention satisfied "a basic and important need" and was an "enormous commercial success" because it concluded that "claim 3 of the 275 patent does not describe McMurtry's probe." *Id.* As we have explained above in part II.A. of this opinion, this is an erroneous interpretation of claim 3 and brings into question the court's apparent findings that no nexus was shown between this invention and commercial success. However, even without considering this additional evidence, we hold that Zeiss has not, as a matter of law, proven by clear and convincing evidence that claim 3 of the '275 patent is invalid as obvious, and the district court's legal conclusion to the contrary is erroneous and must be reversed.

Whether the issue of infringement of claim 3 must be decided on remand or is now moot is left to the discretion of the district court.

## CONCLUSION

The district court's construction of claim 2 of the '998 patent was legally incorrect, and the finding of no infringement, based on this interpretation, must be reversed as clearly erroneous. Since our conclusion is based on the undisputed and properly found facts in the record on appeal, no further fact finding as to liability for infringement of this claim is necessary.

The district court's determination that claim 3 of the '275 patent is invalid was based, alternatively, on a clearly erroneous finding of fact as to the utility requirement, legal error in applying the claim definiteness requirement, and an incorrect legal conclusion of obviousness. The holding of invalidity thus must also be reversed.

As to claim 15 of the '998 patent and claim 1 of the '275 patent, we vacate the judgment of no liability based on the findings of no infringement because it is unnecessary to review them.

Accordingly, the judgment appealed from is reversed-in-part and vacated-in-part, and the case is remanded for determination of damages as to claim 2 of the '998 patent, and for adjudication of any other issues properly raised by the parties that are not moot, in a manner consistent with this opinion.

REVERSED–IN–PART, VACATED–IN–PART, AND REMANDED.

## COSTS AND INTEREST

Each party is to bear its own costs. Pursuant to Fed.R.App.P. 37, interest shall be payable from the date of the judgment reversed.

## APPENDIX

*Claim 2 of the '998 Patent:*

2. A device for mounting a stylus in position-determining apparatus wherein said device and an object are movable relative to each other for providing a signal when said stylus engages said object there-

by indicating the position thereof, said device comprising:

a fixed member,

a movable member to which said stylus is connectable, said movable member being supportable on said fixed member at a plurality of spaced-apart locations, one of the movable and fixed members having at each of said locations a pair of mutually convergent surfaces and the other one of said members being engageable with said convergent surfaces,

bias means for urging said movable member into contact with said fixed member so that all of said convergent surfaces are engaged thereby positively defining a rest position for said movable member, said movable member being removed from said rest position in opposition to said bias means when a force is applied to said stylus, said bias means and convergent surfaces co-operating, on cessation of said force, to return said movable member to said rest position, and

means for providing said signal when said movable member is removed from its rest position.

*Claim 3 of the '275 Patent:*

3. A device for mounting a stylus in position-determining apparatus wherein said device and an object are movable relative to each other and the stylus is engageable with said object, said device comprising:

a fixed member,

a movable member to which said stylus is connectable, said movable member being supportable on said fixed member at a plurality of spaced-apart locations, one of the movable and fixed members having at each of said locations a pair of mutually convergent surfaces and the other one of said members being engageable with said convergent surfaces, and

bias means for urging said movable member into contact with said fixed

member so that all of said convergent surfaces are engaged thereby positively defining a rest position for said movable member, said movable member being removed from said rest position in opposition to said bias means when a force is applied to said stylus, said bias means and convergent surfaces cooperating, on cessation of said force, to return said movable member to said rest position.