DATASTRIP INTERNATIONAL LIMITED, Plaintiff,

v.

INTACTA TECHNOLOGIES, INC., Defendants.

No. CIV.A.1:01–CV–3029–R.

United States District Court,
N.D. Georgia,
Atlanta Division.

March 13, 2003.

Bruce William Baber, King & Spalding, Atlanta, GA, Milton Springut (Pro Hac Vice), David A. Kalow (Pro Hac Vice), David S. Brafman (Pro Hac Vice), Kalow & Springut, New York City, for Plaintiff.

William M. Ragland, Jr., Jeanene L. Jobst, Powell Goldstein Frazer & Murphy, Atlanta, D. William Toone (Pro Hac Vice), Brian C. Park (Pro Hac Vice), Andrew F. Pratt (Pro Hac Vice), Dorsey & Whitney, Seattle, WA, for Defendant.

### *ORDER*

STORY, District Judge.

Plaintiff Datastrip International Limited ("Datastrip") filed this suit against Defendant Intacta Technologies, Inc. ("Intacta"), alleging patent infringement. Now before the Court for consideration are Defendant's Motion for Summary Judgment of Non–Infringement [30–1]; Plaintiff's Motion for Hearing on the Motion for Summary Judgment [39–1]; Plaintiff's Motion to Amend Complaint [42–1]; and Plaintiff's Motion for Leave to File Amended Complaint [42–2]. After considering the entire record, the Court enters the following Order.

As a preliminary matter, the Court finds that the parties have adequately briefed the issues and oral argument is not required. Accordingly, Plaintiff's Motion for Hearing on the Motion for Summary Judgment [39–1] is hereby **DENIED**.

### I. Factual Background

Unless otherwise noted, the following facts are undisputed. Datastrip filed this suit against Intacta, alleging that Intacta is infringing U.S. Patent No. 4,782,221 ("the '221 patent"), which Datastrip owns.

Datastrip and Intacta have each developed systems for encoding information that involves printing on a substrate such as paper. As Datastrip describes its invention, "data strips" provide a way to encode information using parallel rows of black and white dots, resembling a complicated checkerboard. (Glaberson Decl. ¶ 7.) The black and white dots are "dibits," which represent binary zeros and ones. (Springut Decl. Ex. 2, '221 patent, col. 3, ll. 55–59.) Unlike a traditional UPC bar code, which can represent only a small amount of information, data strips are capable of storing much larger amounts of information in a given space. (Glaberson Decl. ¶ 7.) Data strips have been used on identification cards, bills of lading, and as a compact way to encode computer programs. (*Id.* ¶¶ 9–10.) Further, a data strip may be scanned by a computer, eliminating the need for a user to manually enter the data into a computer system. (*See id.* ¶ 9 (describing use of scanner).)

The defendant's accused product, Intacta.CODE, is marketed as a system for securely conveying encrypted information via the Internet or fax modems. (Def.'s Mot. for Summ. J. at 8.) As described in more detail below, Intacta.CODE applies a series of compression and encryption routines to raw data so that it may be securely conveyed. (*Id.* at 9.) Intacta.CODE generates an image using black and white dots that represent binary zeros and ones. (Na'aman Aff. ¶¶ 5, 9.) This image may be read by a computer, which must use a decoding program to convert the data in the image into the original data. (*Id.* ¶ 24.)

The parties dispute whether Intacta.CODE incorporates the features of Datastrip's invention protected by claim 1 of Datastrip's patent. Claim 1 of the '221 patent recites:

1. A data strip containing a plurality of encoded data bits for scanning by an optical scanner, said strip including

a paper-like substrate,

a plurality of aligned, contiguous, parallel data lines, each said line being formed of contiguous bit areas, information being encoded in said bit areas by the presence or absence of printing thereon, and said bit areas being of uniform and predetermined height and width, the height thereof defining the width of said data line, said data lines running transversely of the longitudinal direction of said data strip, and

said plurality of data lines together defining an encoded data portion of said data strip, said data lines being an *integrated whole*, with said data lines being so interrelated that the totality of information carried within said data portion in said data strip is *sequential from each said data line.*

(Springut Decl. Ex. 2, '221 patent, col. 7, ll. 17–36 (emphasis added).) The parties dispute the meaning of the term "integrated whole" and the phrase "sequential from each said data line." They further disagree whether these limitations literally read on Intacta.CODE.

Intacta has moved for summary judgment of non-infringement, arguing that the '221 patent does not read on Intacta.CODE. Datastrip has moved to amend its Complaint to add two of Intacta's subsidiaries as defendants. These motions are addressed in turn.

## II. Motion for Summary Judgment of Non–Infringement

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the non-movant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"[S]ummary judgment is as appropriate in a patent case as in any other." *Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.,* 853 F.2d 1557, 1561 (Fed.Cir.1988) (internal quotations omitted). A literal infringement analysis involves two steps. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed.Cir.1998) (en banc). First, the court must construe the asserted patent claims and determine their acquired meaning. *Markman v. Westview Instruments,* 517 U.S. 370, 388, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); *Cybor,* 138 F.3d at 1454. Second, the court determines whether there is infringement by comparing the properly construed claims to the allegedly infringing product. *Cybor,* 138 F.3d at 1454. Claim construction is a matter of law, while infringement is a matter of fact. *Id.; Insituform Techs., Inc. v. Cat Contracting, Inc.,* 161 F.3d 688, 692 (Fed. Cir.1998).

## A. Claim Construction

Claim construction methodology prefers certain sources of meaning over others. *Vitronics Corp. v. Conceptronic,* 90 F.3d 1576, 1582 (Fed.Cir.1996). Intrinsic evidence, including the language of the claims, the specification, and the prosecu-

tion history, "is the most significant source of the legally operative meaning of disputed claim language." *Id.* The language of the claims themselves is the starting point, where words are presumed to have their plain and ordinary meaning unless the patent applicant acted as a lexicographer. *K–2 Corp. v. Salomon S.A.,* 191 F.3d 1356, 1363 (Fed.Cir.1999); *Vitronics,* 90 F.3d at 1582. Dictionaries "are particularly useful resources to assist the court in determining the ordinary and customary meanings of claim terms." *Tex. Digital Sys., Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1202 (Fed. Cir.2002). However, courts must examine the intrinsic record to determine whether the words of a claim are used inconsistently with their ordinary meanings. *Id.* at 1204. Thus, claim construction requires a review of the patent specification to determine whether the applicant used words in a way contrary to their ordinary meanings. *Vitronics,* 90 F.3d at 1582. Finally, the prosecution history may be "of critical significance in determining the meaning of the claims." *Id.* If the intrinsic evidence resolves any ambiguities about the meaning of the disputed terms, it is improper to rely on extrinsic evidence. *Interactive Gift Express v. Compuserve,* 231 F.3d 859, 866 (Fed.Cir.2000); *Vitronics,* 90 F.3d at 1583.

Here, the Court is asked to construe the term "integrated whole" and the phrase "sequential from each said data line."

### 1. *"Integrated whole"*

Intacta argues that the term "integrated whole" is properly construed to mean that "the entire file to be encoded must be present on the page and that the file cannot be compressed to eliminate portions of the file." (Def.'s Mot. for Summ. J. at 16.) Datastrip responds that "integrated whole" should be construed to mean "that the data lines encode data to be read as a unity, in contrast to information stored in particular positions that can

be read or searched for individually." (Pl.'s Opp'n to Summ. J. at 19.)

Beginning with the ordinary meaning of the words, "integrated" means "composed of separate parts united together to form a more complete, harmonious, or coordinated entity." Webster's 3d New Int'l Dictionary 1174 (1976) [hereinafter "Webster's"]. Used as a noun, "whole" means "a complete amount of sum: a number, aggregate, or totality lacking no part, member, or element;" "something constituting a complex unity: a coherent system or organization of parts fitting or working together as one." *Id.* at 2611. The patent specification does not indicate that the applicant provided any alternative definition of "integrated whole;" however, Datastrip submits that the prosecution history sheds light on the meaning of the words. The Court agrees.

As originally proposed in the patent application, claim 1 did not contain the phrase "data lines being an integrated whole." (*See* Toone Decl. Ex. D, at D–31 (showing original language).) Instead, the claim element read, "said plurality of data lines together defining an encoded portion of said data strip." (*Id.*) Later, however, the Patent Office rejected claim 1, asserting that the claim was obvious in light of three prior art references: the Levasseur patent, the Gokey patent, and a Patent Cooperation Treaty publication. (*Id.* at D–176.) In response, the applicants amended the proposed claim, adding "integrated whole" as it exists today, and explaining:

> Claim 1 is directed to the *sequential, unified, and contiguous* encoding of data. Thus, the claim is distinguished from a data-encoding structure which is for "look-up" reference purposes, i.e., where the structure is not read as a whole, but is used only for finding a particular item of data....

*Levasseur* is not a data strip to be read as a whole, but [ ] a microfiche film [to] look up particular information....

. . . . .

What *Levasseur* actually teaches, as set forth in our prior amendment, is that his rows and groups should be spaced.

By contrast, the information portion of Applicants' invention contains a unitary block of information to be read as a whole.

(*Id.* at D–175 to –177 (internal citations omitted).) Consistent with the ordinary meaning of the words, the prosecution history illustrates that "integrated whole" is included in the claim to distinguish prior art that could be read in a piecemeal fashion and used "for look-up purposes." (*Id.* at D–177.) Unlike data stored in look-up fields, therefore, the "integrated whole" of the data strip contains a unitary block of information.

Intacta argues for a different meaning, "that the entire file to be encoded must be present on the page and that the file cannot be compressed to eliminate portions of the file." (Def.'s Mot. for Summ. J. at 24.) While Intacta acknowledges that the words "integrated whole" were added to overcome references cited by the Patent Examiner, Intacta does not reconcile the prosecution history with its requested meaning of the words. Instead, Intacta's proffered meaning places emphasis on the "file" that will be represented in a data strip, a meaning unsupported by the language, the specification, or the prosecution history. The Court concludes that the plain meaning of the words and the prosecution history support the following construction: "integrated whole" means that the data lines encode data to be read as a unity, in contrast to information stored in particular positions that can be read or searched for individually.

2. *"Sequential from each said data line"*

In prior litigation, Datastrip brought suit against Symbol Technologies, Inc. in the U.S. District Court for the District of Delaware, alleging infringement of the '221 patent. During the litigation, the court construed the term "sequential" in claim 1 to mean "that the data in the data strip is written, or encoded, sequentially from beginning to middle to end." *Datastrip Ltd. v. Symbol Techs., Inc.*, No. 97–70, at 9 (D.Del. Apr. 20, 1999). The parties agree that this is the correct construction; thus, the Court need not decide whether to apply the doctrine of issue preclusion. *See Markman*, 517 U.S. at 391, 116 S.Ct. 1384 ("principles of issue preclusion would ordinarily foster uniformity"); *Blonder–Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 350, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971) (non-mutual defensive collateral estoppel may be raised as defense to patent infringement claim). *Compare Abbott Labs., Inc. v. Dey, L.P.*, 110 F.Supp.2d 667, 669–71 (N.D.Ill.2000) (doctrine of issue preclusion barred plaintiffs from relitigating claim construction issues decided in prior action against different alleged infringer), *with Graco Children's Prods., Inc. v. Regalo Int'l, LLC*, 77 F.Supp.2d 660, 664–65 (E.D.Pa.1999) (declining to apply doctrine where claim construction in previous litigation was not essential to final judgment).

■ Intacta, however, urges the Court to construe the phrase "sequential *from each said data line*" to mean that the "sequential information within the said data lines is sequentially related to the information in the lines preceding and following the data line." (Def.'s Mot. for Summ. J. at 15.) Datastrip disagrees with this interpretation.

Thus, the Court need not construe "sequential" because the parties agree on its

meaning, but the clause "from each said data line" is in dispute. Beginning again with the ordinary meaning of the words, "from" is "used as a function word to indicate a starting point . . . ." Webster's at 913. As used in the patent specification, data lines consist of "a totality of dibits . . . . running sequentially." (Springut Decl. Ex. 2, '221 patent, col. 4, ll. 33–35.) Figure 4 of the patent depicts "an enlarged view of a portion of a data strip." (*Id.* at Sheet 2.) From this figure and the specification, it is apparent that the data lines in a data strip are "parallel, contiguous, and start along a common line." (*Id.* col. 4, ll. 47–48.) The specification further states: "Preferably, information is encoded sequentially along each data line 11, and sequentially along contiguous data lines, beginning at the top of encoded portion 23 and running to the bottom of portion 23, though other sequencing may be used." (*Id.* col. 4, ll. 49–54.) The consistent use of the word "contiguous" in the specification supports Intacta's construction. "Contiguous" means "touching along boundaries often for considerable distances;" "immediately preceding or following in time or sequence." Webster's at 492. Reading the plain meaning of "sequential from each said data line" with the patent specification, it appears that not only is the information encoded from beginning to middle to end within each line, but it is also encoded from beginning to middle to end starting at one line and moving to the next.

This construction is supported by the prosecution history. The phrase under consideration was not part of claim 1 in the original application. (*See* Toone Decl. Ex. D at D–3 (showing original language).) Indeed, the applicants added the phrase to overcome prior art references, in particular, the Ogden patent. As the applicants explained, Ogden's "lines are laid out to be read in parallel, rather than sequentially." (Toone Decl. Ex. D at D–69.) Indeed, the applicants distinguished the data strip by explaining, "the information in one data line of the data strip is sequentially related to that *in the preceding and following line,* making the data portion an integrated whole." (*Id.* at D–68 (emphasis added).) Thus, the prosecution history is consistent with the ordinary meaning of the words and supports a construction that acknowledges that data is encoded sequentially from beginning to middle to end and from one line to the next. Accordingly, the Court construes the language "sequential from each said data line" to mean that the sequential information within the data lines is sequentially related to the information in the preceding and following lines.

## B. Infringement

■ To demonstrate literal infringement, "every limitation set forth in a claim must be found in an accused product, exactly." *Southwall Techs. v. Cardinal IG Co.,* 54 F.3d 1570, 1575 (Fed.Cir.1995). Moreover, "[i]f a claim reads merely on a part of an accused device, that is enough for infringement." *SunTiger, Inc. v. Scientific Research Funding Group,* 189 F.3d 1327, 1336 (Fed.Cir.1999).

> It is fundamental that one cannot avoid infringement merely by adding elements if each element recited in the claims is found in the accused device. For example, a pencil structurally infringing a patent claim would not become noninfringing when incorporated into a complex machine that limits or controls what the pencil can write.

*Stiftung v. Renishaw PLC,* 945 F.2d 1173, 1178 (Fed.Cir.1991) (internal quotations omitted). Otherwise, an infringer could avoid infringement "merely by adding additional elements to an infringing device." *SunTiger,* 189 F.3d at 1336.

■ Intacta argues that Intacta.CODE does not infringe the '221 patent as a

matter of law because the "integrated whole" and "sequential from each said data line" limitations are not found in Intacta.CODE images. As Intacta explains its technology, the software begins by compressing a text file (or any other computer file such as a photo), reducing its size by removing redundant aspects of the file. (Na'aman Aff. ¶ 11.) Next, the data is encrypted, (Id. ¶ 13), before undergoing another encoding step that changes data values. (Id. ¶ 14.) Forward-error correction data is then added to the file, (Id. ¶ 15), after which "the software creates the Intacta.CODE image." (Id. ¶ 17.) The data is arranged in ninety-six-byte blocks, which are then rearranged according to a data-scattering scheme. (Id. ¶¶ 17–18.) After the scattering step, the software further encrypts the data and adds "control sum" lines after every third line of scattered data. (Id. ¶¶ 20–21.) The control sum line is used by the reading computer to .determine whether data from the three lines above the control sum line was read correctly. (Id. ¶ 22.) The final image consists of black and white dots and is set forth at Exhibit K to the Na'aman Affidavit. That image may then be scanned and decoded by performing the reverse of the processes described above. (Id. ¶ 24.)

### 1. Infringement with respect to "integrated whole"

Because the file is compressed and, as represented in the final image, does not contain the full amount of original data, Intacta submits that the data as encoded in a strip is not an "integrated whole." In contrast, Datastrip characterizes the compression, encryption, forward error correction, scattering, and addition of control sum data as "preprocessing" that is irrelevant to how the data is printed. (Williams Aff. ¶¶ 10–11; Glaberson Decl. ¶ 13.) Indeed, Datastrip points out that its method of encoding information works as claimed regardless of any preprocessing that a

data set would undergo. (See Glaberson Decl. ¶¶ 12–13 (stating data can be encoded in data strip regardless of preprocessing such as compression and encryption).) Thus, any preprocessing does not keep the final data in the final image from being an integrated whole because the final image is still meant to be read as a unity. Datastrip supports this argument with evidence from its expert, who explains that the Intacta.CODE image "is an integrated whole that must be read, decoded and used as a unitary block, as distinguished from a code or other data storage structure with lookup fields." (Williams Aff. ¶ 43.)

In reply, Intacta reiterates its argument that the Intacta.CODE image is not an integrated whole because it represents compressed data. Intacta further argues that Intacta.CODE includes position encoded information because the control sum lines are found at every fourth line of the Intacta.CODE image. (Na'aman Aff. ¶¶ 11–12.)

The Court finds that Datastrip has submitted evidence showing a genuine issue of material fact whether Intacta.CODE's data lines are an integrated whole. As construed above, "integrated whole" has no relationship to whether data may be compressed or encrypted prior to being encoded in data lines. Datastrip has presented evidence that its product has always been amenable to representing compressed or encrypted data. A reasonable jury could hear the conflicting evidence and conclude that data preprocessing "is merely [an] additional element" that does not keep the data in an Intacta.CODE image from being an integrated whole. *SunTiger*, 189 F.3d at 1336.

Nor are Intacta's control-sum-line arguments sufficient to meet its summary judgment burden with respect to the limitation "integrated whole." Even though Intacta's expert states that the Intacta image is

created prior to the addition of control-sum lines, (Na'aman Aff. ¶ 17), other evidence suggests that the "image" to which he refers is simply a "grid in [the computer's] memory." (Springut Aff. Ex. 5 (Na'aman Dep. at 174).) This evidence is consistent with Datastrip's evidence describing the control sum lines as a preprocessing step. Intacta has provided no evidence showing that the *final* image stores information "in particular positions that can be read or searched for individually," as the construed term "integrated whole" disclaims.

### 2. Infringement with respect to "sequential from each said data line"

■ Intacta contends that the control sum lines keep the data from being encoded sequentially from one line to another. As its expert describes, "an individual byte in the control sum line has no sequential relationship to the bytes on either side of it." (*Id.* ¶ 22.) While Intacta.CODE does not sequentially encode the original set of data prior to the preprocessing, Datastrip submits evidence to show that the processed data-including the control sum lines-is sequentially arranged in data lines from one line to the next, as an integrated whole. In support of these arguments, Datastrip's expert states that he has reviewed the source code for Intacta.CODE and determined that the specific function that generates the Intacta.CODE image is called "BitBlt." (*Id.* ¶ 36; *see also* Springut Decl. Ex. 5 (Na'aman Dep. at 174) (data in memory is printed with function called "BitBlt").) "BitBlt" uses the parameter "SrcCopy" to copy specified data, "in exact bit-by-bit sequence, from a 'source' to a 'destination.'" (Williams Aff. ¶¶ 37–39.) After preprocessing, *including the addition of the control sum lines,* the final set of data to be encoded "is sequentially encoded in the printed image, from character to character, line to line, begin-

ning to middle to end." (Williams Aff. ¶ 42.)

Because the original data is "completely out of sequence" in the Intacta.CODE image, Intacta replies that its product is not covered by the limitations in claim 1. In response to Datastrip's evidence regarding how the Intacta data is transformed into the image, Intacta writes that "Datastrip's inconsistent position is based on the assumption that it is the order of copying that matters. Claim 1 contains no such language . . . ." (Def.'s Reply at 12.)

The Court finds that Datastrip has submitted evidence showing genuine issues of material fact whether Intacta's data lines are sequential from each said data line. As described above, the control sum lines upon which Intacta relies may be meaningful only as part of a grid in a computer's memory. Notably, Intacta's Reply points to no evidence that counters Datastrip's evidence that the "BitBlt" function, in "copying the source," does so in exact bit-by-bit sequence, causing the processed data to be encoded sequentially. While Intacta has submitted evidence suggesting that its *original* data is not encoded sequentially, Datastrip has provided evidence from which a reasonable jury could conclude that the *final* data is encoded in sequence, from one line to the next, in a unified whole. A reasonable juror could thus conclude that the image is a sequential representation of a data file.

With respect to both of the disputed limitations in claim 1, Datastrip's evidence illustrates that Intacta.CODE's compression, encryption, and control-sum lines may simply be "a complex machine that limits or controls what a pencil can write." *Stiftung,* 945 F.2d at 1178. Summary judgment of non-infringement is not warranted because there remain genuine issues of fact whether the Intacta.CODE image represents data sequentially, as an

integrated whole. Accordingly, Intacta's Motion for Summary Judgment of Non–Infringement [39–1] is hereby **DENIED**.

## III. Motions to Amend

■ Datastrip seeks to amend its Complaint to add two of Intacta's subsidiaries as defendants. Through discovery, Datastrip learned that the development, marketing, and selling of Intacta.CODE is done by Intacta Delaware, Inc., which is headquartered in Georgia; and Intacta Labs, Inc., which is located in Israel ("the subsidiaries"). As Datastrip argues, it is concerned that if it prevails and obtains an injunction against Intacta, the subsidiaries will not be subject to the injunction because they are non-parties. Intacta opposes the Motion, and contends that because Datastrip should have been able to determine the existence of the subsidiaries from public information, it has not shown good cause for its delay in moving to amend the Complaint. Further, Intacta argues that allowing an amendment will unnecessarily and unfairly prejudice Intacta.

Where a court has entered a scheduling order pursuant to Federal Rule of Civil Procedure 16, motions to amend made after a deadline are subject to a "good cause" requirement. Federal Rule of Civil Procedure 16(b) provides that "[a] schedule shall not be modified except upon a showing of good cause and by leave of the district judge ...." Fed.R.Civ.P. 16(b). The good cause standard "precludes modification unless the schedule cannot be met despite the diligence of the party seeking extension." *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418 (11th Cir.1998) (quoting Fed.R.Civ.P. 16 advisory committee's note). Courts evaluating motions to amend under these circumstances must apply the good cause rubric of Rule 16 before considering whether amendments are proper under Rule 15 or 21. *Sosa*, 133 F.3d at 1419.

Here, Intacta argues that the Preliminary Report and Discovery Schedule, filed with the Court on January 25, 2002, states that amendments to the pleadings submitted later than thirty days after the filing of the Schedule will not be accepted unless otherwise permitted by law. The Court, however, did not sign the Preliminary Report and Discovery Schedule, but rather entered a different Scheduling Order on March 29, 2002. The March 29 Scheduling Order does not set forth deadlines for filing amendments. Neither party called the Court's attention to this oversight, and both parties appear to have conducted discovery according to the March 29 Order. Because the Scheduling Order does not contain limitations for amending pleadings, the Rule 16 good cause requirement is not applicable.

Even if the Court were to require a showing of good cause, however, the circumstances here justify allowing Datastrip's amendment. Datastrip has submitted evidence showing that it learned of Intacta's relationship with its subsidiaries through discovery, months after the purported deadline to amend had passed. (*See* Pl.'s Mot. to Amend Ex. A at 39; *Id.* Ex. B at 28.) While Intacta argues that Datastrip should have been aware of the subsidiaries through Intacta's public filings, the filings that Intacta submits in support of this argument do not necessarily show that the subsidiaries are engaged in allegedly infringing activities with respect to the '221 patent. (*See, e.g.,* Def.'s Opp'n to Mot. to Amend Ex. A at F–8 ("Intacta Labs, Ltd., a wholly owned subsidiary ... is currently conducting *new research projects ....*") (emphasis added).) Indeed, Intacta's own SEC filings state that Intacta "is a developer and marketer of software products based on its patented technology that ... transforms any data ... from a binary file into IN-TACTA.CODE ...." (*Id.* Ex. B at 7.)

Based on that information, it was reasonable for Datastrip to name Intacta as the defendant, and while the existence of the subsidiaries may have been known to Datastrip at the time of filing, their activities did not become clear until after any thirty-day deadline would have passed. If Rule 16 were applicable, these circumstances would justify a finding of good cause; accordingly, the Court considers whether Datastrip's proposed amendments are proper.

Federal Rule of Civil Procedure 15 provides that after responsive pleadings have been filed, "a party may amend the party's pleading only by leave of court . . . and leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Further, Rule 21 provides that parties may be added by order of the court "at any stage of the action and on such terms as are just." Fed.R.Civ.P. 21. After a responsive pleading has been served, the standards for deciding a motion to amend a complaint to add a party are the same under Rule 15 or Rule 21. *Loggerhead Turtle v. County Council of Volusia County*, 148 F.3d 1231, 1255 (11th Cir.1998). Thus,

> In the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.-the leave sought should, as the rules require, be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

There is no evidence before the Court that Datastrip intended to cause undue delay, acted with bad faith, or had a dilatory motive. This motion represents the first time in the course of the litigation that Datastrip has moved to amend, and there is no indication that the proposed amendment would be futile. Moreover, Datastrip submits that no additional discovery would be needed with the addition of the subsidiaries; Intacta has already produced documents from the subsidiaries' files, and an employee of each subsidiary has already been produced as a Rule 30(b)(6) witness.

Intacta argues, however, that the amendment would cause it undue prejudice. In its Opposition Brief, Intacta explains that "the parties have discussed the issue of adding Intacta's subsidiaries at length." (Def.'s Opp'n to Pl.'s Mot. to Amend at 6.) Intacta submits that it has verbally agreed that any judgment against it in this case will be binding on its subsidiaries; moreover, Intacta states that it has offered to "formalize this with Datastrip if necessary." (*Id.*; Clugston Decl. ¶ 2.) Thus, Intacta reasons that the only effect of adding its subsidiaries to the Complaint will be "to hinder Intacta's ability to attract investors, form business partnerships, or otherwise conduct its business." (Def.'s Opp'n at 6.)

This reasoning does not illustrate undue prejudice. Even if Intacta's subsidiaries were only contractually obligated to comply with any Order of this Court, potential investors and other entities might still require disclosure of such a contract. Further, Datastrip points out that if its Motion to Amend is not granted, Datastrip will simply file another suit against the subsidiaries, which would have the same potential effects on Intacta's business. Finally, Intacta cites no authority, nor does the Court find any, that supports the proposition that potential harm to a company's business is a sufficient reason to deny a motion to amend in these circumstances. *Cf. E.I. duPont de Nemours & Co. v. Phillips Petroleum Co.*, 621 F.Supp. 310, 314–15 (D.Del.1985) (finding no prejudice

and granting motion to amend to add subsidiary as defendant in patent litigation). The Court finds that the terms of the proposed amendment are just; accordingly, Plaintiff's Motion to Amend Complaint [42–1] and Plaintiff's Motion for Leave to File Amended Complaint [42–2] are hereby **GRANTED**.

## IV. Conclusion

The Court construes the disputed claim language as follows:

1. "Integrated whole" means that the data lines encode data to be read as a unity, in contrast to information stored in particular positions that can be read or searched for individually.

2. "Sequential from each said data line" means that the sequential information within the data lines is sequentially related to the information in the preceding and following lines.

Defendant's Motion for Summary Judgment of Non–Infringement [30–1] is hereby **DENIED**; Plaintiff's Motion for Hearing on the Motion for Summary Judgment [39–1] is hereby **DENIED**; Plaintiff's Motion to Amend Complaint [42–1] is hereby **GRANTED**; and Plaintiff's Motion for Leave to File Amended Complaint [42–2] is hereby **GRANTED**.